**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| 325 S. 18TH STREET, LLC and BRUCE FASSETT, | |
| *Plaintiffs,* | CIVIL ACTION NO. 25-6867 |
| v. | |
| PHILADELPHIA COMMUNITY DEVELOPMENT COALITION, et al., | |
| *Defendants.* | |

**Pappert, J.**                                                                    **June 18, 2026**

<u>**MEMORANDUM**</u>

Nearly nine years ago, the Philadelphia County Court of Common Pleas placed blighted properties at 325 S. 18th Street and 5105 Overbrook Avenue into conservatorships under Pennsylvania's Abandoned and Blighted Property Conservatorship Act, known as Act 135. The owners of those properties, 325 S. 18th Street, LLC and Bruce Fassett, have since challenged the conservatorships and, incessantly, sued everyone associated with them in state and federal court. Every court—including this one—have rejected their theories.

This lawsuit is their latest blunder. Plaintiffs believe the City of Philadelphia, along with numerous corporations and citizens, used Act 135 to exploit their properties for profit. The Court dismissed the initial complaint without prejudice as a shotgun pleading under Federal Rule of Civil Procedure 8(a). Plaintiffs amended and sought leave to amend again, which the Court granted. They now allege twelve claims against thirteen defendants, all of which move to dismiss on various grounds. Several of them

1

also seek to designate Plaintiffs and their former attorney Olivia Adams as "vexatious litigants" and enjoin them from filing additional lawsuits without court approval.

Before they could respond to the motions, the Supreme Court of Pennsylvania suspended Adams from the Pennsylvania Bar for various ethical violations related to her misconduct in the conservatorship proceedings. (Apr. 17, 2026 Pa. S. Ct. Ord. Suspending Adams, Dkt. No. 52-1.) This Court subsequently held an on-the-record status conference with the parties, during which Plaintiffs' new counsel confirmed he had closely reviewed the Second Amended Complaint and adopted all its allegations. (May 13, 2026 Status Conf. Tr. at 4:14–24.) The Court cautioned him about the case's lengthy procedural history and suggested he could amend if he wished, but he stated he stood by the Second Amended Complaint and would instead respond to the motions to dismiss.[1] (*Id.* at 4:14–24, 6:18–7:3, 7:20–8:8, 11:18–12:17.) He did so several weeks later.

The Court grants the motions, dismisses all claims with prejudice, and denies the request to designate Plaintiffs and Adams as "vexatious litigants."

I

At least ten separate decisions have explained this case's excruciating history. *See 325 S. 18th St., LLC v. Phila. Cmty. Dev. Coal.*, No. 25-3929, 2026 WL 482850, at *1–2 (E.D. Pa. Feb. 20, 2026) (collecting cases). Plaintiffs' claims involve Act 135, which allows court-appointed conservators to bring blighted properties into municipal code compliance. *See* 68 Pa. Stat. & Cons. Stat. Ann. § 1102(6).

---

[1]    Counsel now says he "does not adopt the rhetoric of the prior pleadings." (Pls.' Mem. of L. in Opp'n. to Toner Defs. at 6, Dkt. No. 66-1.) The Court does not understand what that means. He already "adopted all of the allegations" in the Second Amended Complaint. (May 13, 2026 Status Conf. 4:19–21.)

2

A

In June of 2016, the Philadelphia Community Development Coalition, represented by attorney Paul Toner,[2] petitioned the Philadelphia County Court of Common Pleas to place a property at 325 S. 18th Street into an Act 135 conservatorship. *See* (SAC ¶¶ 76–77, 89, Dkt. No. 41.)  To support the petition, engineer Gregory Bustamante testified that the property was "dangerous and deteriorated" due to "unsafe" chimneys, masonry, roofing and framing, (*id.* ¶ 109), and staff from the Department of Licenses & Inspections informed the court about municipal code violations there, (*id.* ¶¶ 80–81.)  PCDC said it would remediate these issues with its own finances and later seek reimbursement if it was appointed conservator, *see* (*id.* ¶¶ 84–85), which the court did in May of 2017,[3] *see* (*id.* ¶ 83); *Rufo v. Fox*, No. 21-2861, 2021 WL 5399912, at *1 (E.D. Pa. Nov. 18, 2021), *aff'd* 2022 WL 16646689 (3d Cir. Nov. 3, 2022).

PCDC hired Gardner Fox Associates, Inc. as general contractor for the project. (SAC ¶ 98.)  It subcontracted architecture and design of the property to Moto Design Shop, (*id.* ¶ 105), construction to Anthony Delgott and Hybar Construction, (*id.* ¶ 107), demolition and construction to Mangual Demolition, Inc., (*id.* ¶¶ 71, 135), and engineering services and certifications to Bustamante and Bustamante Engineers, Inc., (*id.* ¶ 108.)  PCDC paid Gardner Fox $288,609.50 for its work, (*Id.* ¶ 133), and

---

[2]    Toner worked at Orphanides & Toner, LLP and now works for Toner Law Group, PLLC. (SAC ¶¶ 43–50.)

[3]    A month earlier, Anthony Rufo purchased the property from Theresa Isabella.  *Rufo*, 2021 WL 5399912, at *1.  Rufo is the sole member of 325 S. 18th Street, LLC, which currently retains legal title to the property.  *See* (SAC ¶ 12); (Oct. 3, 2017 Bench Mem. & Ins. Appl. at 129, SAC Ex. J, Dkt. No. 41-1).

requested $429,889.25 in remediation costs in January of 2022, (*id.* ¶¶ 123–24.)  That request supposedly included "illegible" and "non-verifiable" checks from Gardner Fox, proof that PCDC President David Champagne had paid for the work out-of-pocket, "fragmented billing," and "repeated pass-through charges."  (*Id.* ¶¶ 126–27, 134.)  In October of 2022, the court awarded PCDC "substantial remediation and legal fees and authoriz[ed] lien rights that exceeded $1,000,000 against the property."  (*Id.* ¶ 130.)

While remediation was ongoing, PCDC purportedly "positioned" the property for redevelopment with OCF Realty and real estate developer Ori Feibush.  (*Id.* ¶ 138.)  According to materials from the Historical Commission, OCF Realty was the new owner and needed "fast approval of redevelopment now that [PCDC] had 'gained control' of the property."  (*Id.* ¶¶ 139–40.)  Feibush also wrote that "[t]here is no objective dispute on the poor and inadequate work completed," the building "add[ed] no value," and "[e]veryone who touched this property did so from a position of greed."  (*Id.* ¶¶ 141–42); (Nov. 23, 2022 email from Feibush to Adams at 118, SAC Ex. I, Dkt. No. 41-1.)

The property continued to violate various municipal codes even after the project ended.  L&I officials inspected it twice and determined the exterior walls and chimneys were still unsafe.  *See* (SAC ¶¶ 118–20); (Photos. of Mun. Code Violations at 51, 53–55, 60, SAC Ex. F, Dkt. No. 41-1).  Bustamante submitted another report regarding the poor condition of the chimneys,[4] (SAC ¶ 110), and the City issued Mangual a permit to repair these problems, *see* (*id.* ¶ 114).  Plaintiffs contend other structural issues, such

---

[4]      Bustamante testified months earlier that the work "had been completed" and the property "had been stabilized." (SAC ¶ 113.)

as wall separation, missing capping, compromised masonry and water damage, persisted into 2024.[5]  (*Id.* ¶ 121.)

B

PCDC filed another Act 135 petition in December of 2018 against a property at 5105 Overbrook Avenue owned by Bruce Fassett as trustee for Sierra Fassett.  (*Id.* ¶¶ 30, 144.)  The petition included photographs and alleged the property was blighted. (*Id.* ¶¶ 145–48.)  PCDC promised to remediate the property, initially estimated doing so would cost $18,000, (*id.* ¶ 151), and a state court judge appointed it as conservator, (*id.* ¶ 149.)

After the project finished, PCDC sought $275,361.98 in reimbursement costs. (*Id.* ¶ 153.)  That included over $100,000 in charges from Mangual and Bustamante Engineers related to structural work.  *See* (*Id.* ¶¶ 153–56, 162–64).  On February 28, 2024, 5105 Overbrook sold for around $278,000, of which $252,703.39 went to Orphanides & Toner and nothing went to Fassett.  (*Id.* ¶¶ 178–79.)  The court approved distribution of the sale proceeds but ordered PCDC to remit to Fassett $5,041.72—the aggregate cost of the property insurance.[6]  *See Phila. Cmty. Dev. Coal., Inc. v. Fassett*, 946 CD 2024, 2021 WL 12334240, at *1 (Pa. Commw. Ct. Dec. 13, 2024).

C

The Second Amended Complaint spans 466 paragraphs scattered over 105 pages with an additional 342 pages of thirteen exhibits.  They include, among other things,

---

[5]    Judge Ann Butchart approved Qing Qing Ke and Jin Fang Zhang as buyers of the property, and PCDC conveyed the deed to them in 2024.  *See 325 S. 18th St., LLC*, 2026 WL 482850, at *1.

[6]    PCDC couldn't charge Fassett for that cost because it had "misstated" that the property was "vacant" under the terms of the insurance policy.  *Fassett*, 2021 WL 12334240, at *2, *4–5.

5

fee and cost reports, bank ledger entries, accounting records, cost summaries, settlement statements, invoices, trial court orders, photographs of violation notices and the properties, deposition testimony from unspecified court proceedings, insurance applications, hearing transcripts and engineering reports. *See generally* (Pls.' Ex. Index, SAC, Dkt. No. 41-1). Plaintiffs occasionally cite these exhibits but never identify the page number that supports their allegations. *See, e.g.*, (SAC ¶¶ 2, 50, 81, 87, 91, 98, 107–08, 112–14, 118–19, 121, 123, 131, 133, 135, 153, 162–63, 169).

There are twelve claims against thirteen defendants.[7] Counts I and II are civil claims under the federal Racketeer Influenced and Corrupt Organizations Act against PCDC, Champagne, Toner and Toner Law. (*Id.* at 48, 55.) Counts III and IV are procedural and substantive due process claims against the City and PCDC, Champagne, Toner and Toner Law "as willful participants in joint activity." (*Id.* at 60, 66.) Count V is a takings claim under the Fifth Amendment against the City. (*Id.* at 70.) Count VI is a *Monell* claim against the City. (*Id.* at 75.) Count VII is a claim for "fraud / fraudulent misrepresentation" against PCDC, Champagne, Toner and Toner Law. (*Id.* at 79.) Count VIII is an unjust enrichment claim against PCDC, Champagne, Toner, Toner Law, Gardner Fox, Hybar, Mangual and Bustamante Engineers. (*Id.* at 84.) Count IX is a breach of construction contract claim, only brought by 325 LLC, against Gardner Fox. (*Id.* at 88.) Count X is a negligent construction claim, again only brought by 325 LLC, against Gardner Fox, Hybar, Mangual, Bustamante and Bustamante Engineers. (*Id.* at 91.) Count XI is a professional negligence claim against Bustamante, Bustamante Engineers and Moto.

---

[7]    Plaintiffs occasionally list Delgott and Adam Montalbano as defendants, *see* (SAC at 2, 9, 21); (Pls.' Consol. Mem. of L. at 1, Dkt. No. 68), but allege no claims against them.

(*Id.* at 94.)  And, finally, Count XII is a civil conspiracy claim against PCDC, Champagne, Toner, Toner Law, Gardner Fox, Hybar, Moto,[8] Feibush, OCF Realty, Mangual, Bustamante and Bustamante Engineers.  (*Id.* at 98.)

In sum, Plaintiffs allege Defendants conspired to place 325 S. 18th and 5105 Overbrook into conservatorships for monetary gain.  *See* (*Id.* ¶¶ 4, 207, 210).  The conservatorships "left [Plaintiffs] with legal title but crushing lien consequences, incomplete and defective work, and a still-deteriorated property."  (*Id.* ¶ 208.)  They try to support their claims based on "patterns" between the two conservatorships, testimony from the state court proceedings, purported inconsistencies and inaccuracies in various filings, and "payment irregularities."  *See* (*Id.* ¶¶ 5–12, 87, 92–94, 97, 113, 116, 122, 130, 140–43, 161, 165–70, 188–93, 194–97, 207).

## II

## A

The City of Philadelphia moves to dismiss under Federal Rule of Civil Procedure 12(b)(1).  (City's Mem. of L. at 14–15, Dkt. No. 48.)  A court may dismiss any claims over which it lacks subject matter jurisdiction.  Fed. R. Civ. P. 12(b)(1).  Motions invoking Rule 12(b)(1) fall into two categories: facial or factual attacks.  *Davis v. Wells Fargo*, 824 F.3d 333, 346 (3d Cir. 2016).  The City makes a facial attack because it "challenges subject matter jurisdiction without disputing the facts alleged in the complaint and requires the court to consider the allegations of the complaint as true."  *Id.* (citation modified and omitted).  "[A] facial attack calls for a district court to apply

---

[8]    The Second Amended Complaint does not list Moto as a defendant for this claim but then describes its alleged misconduct.  *See* (SAC at 98, ¶ 457).  Moto responds to these allegations, (Moto's Br. at 14–16, Dkt. No. 57-2), so the Court treats it as a defendant.

7

the same standard of review it would use in considering a motion to dismiss under Rule 12(b)(6), *i.e.*, construing the alleged facts in favor of the nonmoving party." *Const. Party of Pa. v. Aichele*, 757 F.3d 347, 358 (3d Cir. 2014).

B

All defendants move to dismiss under Federal Rule of Civil Procedure 12(b)(6). To avoid dismissal against such motions, a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible if the plaintiff pleads facts from which the Court can infer "that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). Although this "plausibility standard is not akin to a 'probability requirement,'" it demands "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

Assessing plausibility under *Twombly* and *Iqbal* is a three-step process. *See Connelly v. Lane Const. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016). Step one is to "take note of the elements the plaintiff must plead to state a claim." *Id.* (alterations omitted) (quoting *Iqbal*, 556 U.S. at 675). Next, the Court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* (quoting *Iqbal*, 556 U.S. at 679). Finally, for all "well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."[9] *Id.* (alteration in original) (quoting

---

[9]     Defendants cite prior federal and state court litigation related to 325 S. 18th and 5105 Overbrook. *See, e.g.*, (Toner Defs.' Rule 12(b)(6) App'x of R. Docs., Dkt. No. 14-3); (Conservator's Sep. 2020 Status Rep., Gardner Fox's Mot. Ex. A, Dkt. No. 55-3). Because those documents are "matters of public record," the Court considers them. *See Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (citation omitted).

8

*Iqbal*, 556 U.S. at 679).  If the well-pleaded facts do not nudge the "claims across the line from conceivable to plausible," the Court must dismiss the complaint.  *Twombly*, 550 U.S. at 570.[10]

III

With respect to the City's motion under Rule 12(b)(1), a case or controversy can exist "only if a plaintiff has standing to sue."  *United States v. Texas*, 599 U.S. 670, 675 (2023); U.S. art. III, § 2 (limiting the "judicial Power" to "Cases" and "Controversies").  To establish Article III standing, a plaintiff must have: "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Associated Builders & Contractors W. Pa. v. Cmty. Coll. of Allegheny Cnty.*, 81 F.4th 279, 287 (3d Cir. 2023) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)).  Only the second element is at issue.  (City's Mem. of L. at 14–15.)

---

[10]     Additionally, Moto moves to dismiss for insufficient service of process.  (Moto's Br. at 18–19.)  Under Rule 4(m), if a defendant is not served within ninety days after the complaint is filed, the Court "must dismiss the action without prejudice against that defendant or order service be made within a specified time."  Fed. R. Civ. P. 4(m).  Upon a showing of good cause for the failure, the Court "must extend the time for service for an appropriate period."  *Id.*

Plaintiffs did not timely serve Moto.  They filed the Complaint on December 5, 2025, (Dkt. No. 1), but served Moto on April 14, 2026, *see* (Aff. of Serv. on Eric Oskey, Dkt. No. 63-6).  Though they filed the Second Amended Complaint on March 26, 2026, an "amended complaint does not toll the Rule 4(m) service period," *Moore v. Walton*, 96 F.4th 616, 626 (3d Cir. 2024) (citation omitted).  "The period provided by Rule 4(m) is not restarted by the filing of an amended complaint."  *Id.* (citation modified and omitted).

Plaintiffs offer no arguments about good cause for their delay.  Still, "the court may in its discretion decide whether to dismiss the case without prejudice or extend time for service."  *Petrucelli v. Bohringer & Ratzinger*, 46 F.3d 1298, 1305 (3d Cir. 1995).  The Court has "broad discretion" in making that decision, and dismissal "is inappropriate when there exists a reasonable prospect that service may yet be obtained."  *Umbenhauer v. Woog*, 969 F.2d 25, 30 (3d Cir. 1992).  Plaintiffs have now served Moto, and it has responded to the allegations in the Second Amended Complaint, *see* (Moto's Br. at 8–17).  Because they do not state claims against Moto under Rule 12(b)(6), the Court, in its discretion, overlooks their untimely service.

Traceability "requires a causal connection between the injury-in-fact and a defendant's conduct." *Lutter v. JNESO*, 86 F.4th 111, 127 (3d Cir. 2023). This requirement is akin to "but for" causation and is "met even where the conduct in question might not have been the proximate cause of the harm, due to intervening events." *Edmonson v. Lincoln Nat'l Life Ins.*, 725 F.3d 406, 418 (3d Cir. 2013) (citation omitted). Even harms that "flow indirectly from the action in question can be said to be 'fairly traceable' to that action for standing purposes." *Focus on Fam. v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1273 (11th Cir. 2003). The injury, however, cannot result from "the independent action of some third party not before the court." *Lutter*, 86 F.4th at 127 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).

Plaintiffs allege a litany of injuries, including loss of possession and use of their properties, lien exposure, ownership burdens, diminished property value, "incomplete and defective work, and a still-deteriorated property." (SAC ¶¶ 207–09); (Pls.' Consol. Mem. of L. at 29.) L&I officials, who acted on behalf of the City, provided the state court with "violation data" related to the properties, testified in support of the Act 135 petitions, and "closed violations and permits" based on representations the work had been completed. (SAC ¶¶ 51–54.) They contend the City failed to adequately train and supervise L&I personnel to verify contractor and engineer certifications, evaluate completion claims, and remain "neutral[]" during the proceedings. (*Id.* ¶ 349.)

Many of these supposed injuries have little to do with the City. State court judges were responsible for adjudicating the conservatorships, *see* 68 Pa. Stat. & Cons. Stat. Ann. §§ 1101–20, and Plaintiffs' apparent theory that those judges deferred to the City's representations which then exacerbated their injuries is based on a "speculative

10

chain of possibilities," *see Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013).  Still, Plaintiffs' allegations that the City did not properly train L&I officials to spot unfinished work is fairly traceable, albeit barely, to the "still-deteriorated conditions" at the properties.  (SAC ¶¶ 207–09.)  Had the City done so, Defendants presumably would have continued to fix 325 S. 18th and 5105 Overbrook until they complied with municipal safety codes, and the conditions there would have improved.  *See Richard Roe W.M. v. Devereux Found.*, 650 F. Supp. 3d 319, 333 (E.D. Pa. 2023) (describing traceability at the motion to dismiss stage as a "low bar").  Because Plaintiffs allege injuries that are fairly traceable to the City's conduct and likely to be redressed by a decision in their favor, they have established Article III standing.

IV

Defendants primarily move to dismiss based on *Younger* abstention and failure to state claims upon which relief could be granted.[11]

A

Federal courts have a "virtually unflagging" obligation to hear and decide a case. *PDX N., Inc. v. Comm'r N.J. Dep't of Lab. & Workforce Dev.*, 978 F.3d 871, 882 (3d Cir. 2020) (quoting *Sprint Commc'ns., Inc. v. Jacobs*, 571 U.S. 69, 77 (2013)).  *Younger* abstention is an exception to that rule and allows a federal court to abstain from exercising jurisdiction where otherwise appropriate if two requirements are met.  *Id.* at 882–84.  First, the Court must determine that the plaintiff's claims would interfere with one of the following types of state proceedings: (1) criminal prosecutions, (2) civil

---

[11]      Several defendants also invoke the Full Faith and Credit Act.  *See* (Toner Defs.' Mem. of L. at 26–27, Dkt. No. 47-1); (Gardner Fox's Mem. of L. at 10–11, Dkt. No. 55-2).  The Court need not address that argument because the Second Amended Complaint does not plausibly state any claims.

enforcement proceedings and (3) "civil proceedings involving orders in furtherance of the state courts' judicial function." *Id.* (citation omitted).  Second, the Court must consider whether: (1) there are "ongoing judicial proceedings," (2) those "proceedings implicate important state interests" and (3) the party against whom abstention is asserted has "an adequate opportunity in the state proceeding to raise constitutional challenges." *Id.* (quoting *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432 (1982)).

Plaintiffs' claims "stem from the Pennsylvania state courts' orders placing the propert[ies] into Act 135 conservatorship[s] and denial of their subsequent appeals." *Rufo*, 2022 WL 16646689, at *3.  They rely on representations in Act 135 petitions, financial submissions, arguments and testimony—all of which occurred in conservatorship proceedings before the Philadelphia County Court of Common Pleas. And the relief they seek includes:

- Disgorgement of "all proceeds, fees, payments, and financial benefits obtained . . . through the conduct described herein";

- Just compensation for "taking" their properties, "including loss of equity, value, and use";

- "Restitution and disgorgement of all funds unjustly retained by Defendants, including construction payments, legal fees, and conservatorship-related charges";

- "Equitable relief necessary to unwind or offset unjust enrichment and to restore Plaintiffs, to the extent possible, to the position they would have occupied absent Defendants' conduct"; and

- Injunctive and "other equitable relief" the Court "deems necessary to prevent further enforcement of claims derived from the challenged conduct."

(SAC at 102–04.)  Providing any of that relief would "circumvent the Pennsylvania state court's judicial function of adjudicating the conservatorship."  *Rufo*, 2022 WL 16646689, at *3.

But it's not clear whether the proceedings are ongoing.  Defendants conclusorily say as much but cite nothing to support that proposition.[12]  *See* (Toner Defs.' Mem. of L. at 28–29); (City's Mem. of L. at 13–14); (Gardner Fox's Mem. of L. at 11–12).  To the contrary, several of them concede "the only matters that have not been resolved with finality relate to the (second) appeal . . . to strike the deed issued to the current owners of 5105 Overbrook Avenue and challenge the sufficiency of the accounting . . . in awarding PCDC with its underlying Costs of Conservatorship."  (Toner Defs.' Mem. of L. at 27.)  Because the Court cannot discern the current status of the conservatorship proceedings, *Younger* abstention is inappropriate.  *PDX N., Inc.*, 978 F.3d at 882 (reversing *Younger* abstention where "there was no ongoing judicial proceeding"); *Sprint Commc'ns, Inc.*, 571 U.S. at 70 ("[O]nly exceptional circumstances justify a federal court's refusal to decide a case in deference to the States . . . ." (citation omitted)).

B

Although *Younger* doesn't apply, none of the twelve counts state claims upon which relief can be granted.

---

[12]     Several defendants provided a 592-page appendix in response to Plaintiffs' initial complaint. *See generally* (Toner Defs.' Rule 12(b)(6) App'x of R. Docs).  They don't cite it to support *Younger* abstention, and nothing in that appendix shows either conservatorship is active.  *Cf. Gross v. Town of Cicero*, 619 F.3d 697, 702 (7th Cir. 2010) ("Judges are not like pigs, hunting for truffles buried in the record." (citation modified and omitted)).

1

Plaintiffs first bring a civil RICO claim under 18 U.S.C. § 1962(c) against PCDC, Champagne, Toner and Toner Law.  To state such a claim, a plaintiff must allege: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity, plus an injury to business or property."  *Reyes v. Netdeposit, LLC*, 802 F.3d 469, 483 (3d Cir. 2015) (citation omitted).  A "pattern" of "racketeering activity" requires at least two predicate acts specifically enumerated in the statute.  18 U.S.C. §§ 1961(1), (5), 1964 (permitting civil suits).

They base their RICO claim on mail and wire fraud.  (SAC ¶ 215.)  To establish either as predicate acts, a plaintiff must allege: "(1) a scheme to defraud, (2) use of the mail or interstate wires to further that scheme, and (3) fraudulent intent."  *Jaye v. Oak Knoll Vill. Condo. Owners Ass'n, Inc.*, 751 F. App'x 293, 297 (3d Cir. 2018); 18 U.S.C. §§ 1341, 1343.  Both claims must be pled with particularity to satisfy Federal Rule of Civil Procedure 9(b).  *See Banks v. Wolk*, 918 F.2d 418, 422 n.1 (3d Cir. 1990).  A plaintiff must provide "the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation."  *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007).

Plaintiffs allege six predicate acts:

- Filing insurance materials that were "materially inconsistent" with other representations about 325 S. 18th in the Act 135 petition;

- Submitting invoices, summaries and checks for work related to 325 S. 18th that were "illegible, overlaid or otherwise non-verifiable";

- Making "materially misleading" or "reckless" representations during a hearing that work on 325 S. 18th was finished, the property was stabilized, and all violations were resolved;

14

- Submitting an Act 135 petition for 5105 Overbrook citing blighted conditions that had already been fixed;

- Providing Fassett with "voluminous materials consisting largely of invoices and internal records" to substantiate invoices related to work on 5105 Overbrook; and

- "Misrepresenting" the condition of 5105 Overbrook in an insurance application.

(SAC ¶¶ 134, 215–240.)  Although many of these acts involve the use of interstate wires, *see* (*id.* ¶¶ 219, 224, 232, 236, 240), Plaintiffs never allege the defendants sent mail to further their alleged scheme.  And testifying at a hearing does not somehow amount to "use of the mail or interstate wires."[13]  *See Jaye*, 751 F. App'x at 297; *see also United States v. Bentz*, 21 F.3d 37, 40 (3d Cir. 1994) (holding that §§ 1341 and 1343 require that the defendant "knowingly caused" or could "reasonably . . . foresee[]" the use of mail or interstate wire communications).

None of the alleged predicates, even if true, satisfy the heightened pleading standard.  Plaintiffs deduce mail and wire fraud based on courts filings with purported inconsistencies and inaccuracies, and financial documents they can't verify or understand.  *See* (SAC ¶¶ 215–240); (Pls.' Mem. of L. in Opp'n to Toner Defs. at 23–27).  That inference is implausible.  At worst, their allegations reveal PCDC, Champagne, Toner and Toner Law made minor mistakes in court filings and provided them with a lengthy list of charges to fix properties that they had left blighted.[14]  That does not

---

[13]    In any event, that testimony doesn't indicate a scheme to defraud or fraudulent intent. Plaintiffs merely allege that, several months after the hearing, L&I officials and Bustamante discovered issues with the chimney and exterior wall of the property.  (SAC ¶¶ 113–22.)

[14]    As a basis for three predicates, Plaintiffs contend the defendants made several misrepresentations, *see* (SAC ¶¶ 216–19, 229–32, 237–40), but that's not so.  First, they allege PCDC, Champagne, Toner and Toner Law submitted insurance materials that claimed 325 S. 18th had been vacant since September of 2017, was "vacant residential," and included a building that was

plausibly suggest the defendants concocted a scheme to defraud them or harbored fraudulent intent to do so. *See Hlista v. Safeguard Props., LLC*, 649 F. App'x 217, 222 (3d Cir. 2016) (rejecting a RICO claim where a plaintiff did not allege facts from which a scheme to defraud could be inferred). Nor do they support their claims, outside of conclusory and irrelevant allegations, with the substantiation Rule 9(b) demands. *See Morales v. Superior Living Prods., LLC*, 398 F. App'x 812, 814 (3d Cir. 2010) ("[Plaintiffs] have not supplied any facts that provide some measure of substantiation for their fraud-based RICO claim beyond general averments.").

2

Plaintiffs next allege a civil RICO conspiracy claim under 18 U.S.C. § 1962(d) against PCDC, Champagne, Toner and Toner Law which "must fail [because] the substantive claims are themselves deficient," *see Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1191 (3d Cir. 1993).

---

two stories tall. *See* (*Id.* ¶¶ 91–92). The exhibit they cite never says that, nor do they point to a specific page on which the Court can find that information. *See generally* (Oct. 3, 2017 Bench Mem. & Attached Ins. Appl.); *see also U.S. ex rel. Garst v. Lockheed-Martin Corp.*, 328 F.3d 374, 378 (7th Cir. 2003) ("Rule 8(a) requires parties to make their pleadings straightforward, so that judges and adverse parties need not try to fish a gold coin from a bucket of mud."). Even if the defendants had said as much, nothing indicates those representations were inaccurate—much less fraudulent—in light of the insurance policy.

Second, Plaintiffs allege that "some" of the conditions in the Act 135 petition for 5105 Overbrook "had been corrected before the filing of the petition." (*Id.* ¶ 231.) Yet they never substantiate their allegations and, again, those alleged inaccuracies do not plausibly show mail or wire fraud.

Third, Judge Butchart found PCDC had "misstated," not "misrepresented," the conditions at 5105 Overbrook in an insurance application. *Fassett*, 2021 WL 12334240, at *2. Although the property "was indeed vacant," it did not qualify as such under the specific terms of the insurance policy. *Id.*, at *4–5.

3

a

Plaintiffs also cannot state a procedural due process claim under 42 U.S.C. § 1983. Their claims against PCDC, Champagne, Toner or Toner Law do not survive for reasons the Court and the Third Circuit Court of Appeals explained five years ago. *See Rufo*, 2021 WL 5399912, at *7, *aff'd* 2022 WL 16646689, at *4. None of their nonconclusory allegations show those defendants acted "under color of state law" as required by § 1983 or had "such a close nexus between the State and the challenged action that seemingly private behavior [could] be fairly treated as that of the State itself." *Leshko v. Servis*, 423 F.3d 337, 339 (3d Cir. 2005) (citation omitted). Toner and his law firm are not state actors "solely on the basis of their positions as officers of the court." *Rufo*, 2022 WL 16646689, at *4 (quoting *Angelico v. Lehigh Valley Hosp., Inc.*, 184 F.3d 268, 277 (3d Cir. 1999)). PCDC and Champagne do not become state actors by "being on the winning side of" the conservatorship actions. *Id.* (quoting *Dennis v. Sparks*, 449 U.S. 24, 28 (1980)). And their bare allegations of conspiracy and concerted action with the City, *see* (SAC ¶¶ 270–71), are insufficient to support a § 1983 claim, *see Rufo*, 2021 WL 5399912, at *7 (citation omitted).

Their claim against the City fares no better. Section 1983 does not allow plaintiffs to hold a municipality automatically liable for the unconstitutional actions of its employees under a theory of vicarious liability. *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 691 (1978). Plaintiffs can hold municipalities liable "only for their *own* illegal acts." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (citation modified and omitted). When a municipal officer harms a private party, that party must connect the

17

officer's conduct to a municipal policy or custom.  *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997).  Nowhere in Count III do Plaintiffs "identify a custom or policy, and specify what exactly that custom or policy was."[15]  *McTernan v. City of York*, 564 F.3d 636, 658 (3d Cir. 2009).

b

A procedural due process violation occurs when: "(1) Defendants deprived [Plaintiffs] of an individual [interest] that is encompassed within the Fourteenth Amendment's protection, and (2) the procedures Defendants made available to [them] did not provide due process of law."  *Steele v. Cicchi*, 855 F.3d 494, 507 (3d Cir. 2017).  "The essence of [such] a claim, of course, is notice and an opportunity to be heard."  *Kadakia v. Rutgers*, 633 F. App'x 83, 88 (3d Cir. 2015).

Plaintiffs allege they weren't provided a "meaningful opportunity" to verify their cost claims, inspect the properties, or "test the accuracy" of representations made in the Act 135 petitions.  *See* (SAC ¶¶ 273–89).  That is incorrect.  They have had countless opportunities over the past nine years to challenge those issues.  *See generally* (Toner Defs.' Rule 12(b)(6) App'x of R. Docs); (May 15, 2017 Ord., City's Mot. Ex. A, Dkt. No. 48-1); (Aug. 6, 2019 Ord., City's Mot. Ex. B, Dkt. No. 48-2).  More to the point, the Court of Common Pleas—not the defendants—is responsible for providing them with due process under Act 135.  *See* 68 Pa. Stat. & Cons. Stat. Ann. §§ 1104–05.  And Plaintiffs never allege the defendants made any procedures available to them in the first place.  *See Steele*, 833 F.3d at 494.

---

[15]   Plaintiffs also cannot bring a standalone § 1983 claim against the City "outside of the *Monell* styling in [Count VI]."  *Woods v. Williamsport Area Sch. Dist.*, No. 25-CV-1562, 2026 WL 852054, at *4 (M.D. Pa. Mar. 27, 2026); *see also infra* subsection IV.B.6 (rejecting *Monell* claim against the City).

18

4

Similar reasons doom their substantive due process claim under § 1983, *see supra* subsection IV.B.3.a, which would not prevail regardless.  To state a claim for "arbitrary action," Plaintiffs must allege governmental conduct that "shocks the conscience."  *United Artists Theatre Cir., Inc. v. Township of Warrington*, 316 F.3d 392, 399–400 (3d Cir. 2003).  "[O]nly the most egregious official conduct can be said to be 'arbitrary in the constitutional sense.'"  *Id.* at 399 (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998)).  The alleged conduct falls well short of that level.  *Compare* (SAC ¶¶ 299–304) *with L.R. v. Sch. Dist. of Phila.*, 836 F.3d 235, 246 (3d Cir. 2016) (finding conscience-shocking conduct where a school teacher released a five-year-old child to an unidentified, unverified adult who then sexually assaulted her) *and Croft v. Westmoreland Cnty. Child. & Youth Servs.*, 103 F.3d 1123, 1126–27 (3d Cir. 1997) (same where a social worker, acting on sixth-level hearsay, threatened to remove a child from her home if her father did not leave).

5

The takings claim against the City likewise crashes into *Monell*'s bar.  Plaintiffs cannot sue the City under § 1983 without connecting an official's conduct to a municipal policy or custom, *Brown*, 520 U.S. at 403, and they never do so in Count V, *see* (SAC ¶¶ 313–335).

Even if they could, the claim would peter out.  The Fifth Amendment's Takings Clause provides that "private property [shall] not be taken for public use, without just compensation."  U.S. Const. amend. V.  It protects against two types of takings.  The first, a "*per se* taking," occurs where the government "physically takes possession of

19

property without acquiring title to it." *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 147–48 (2021). The second, a "regulatory taking," occurs "[w]hen the government, rather than appropriating private property for itself or a third party, instead imposes regulations that restrict an owner's ability to use his own property." *Id.* at 148. To determine whether a taking occurred, a court must "balanc[e] factors such as the economic impact of the regulation, its interference with reasonable investment-backed expectations, and the character of the government action." *Id.*

Plaintiffs do not plausibly allege either type of taking. First, they never contend the City physically took possession of their properties. Second, they believe the City "supported and facilitated the conservatorship proceedings," issued municipal code violations against their properties, and accepted certifications and permits related to the conservatorships. (SAC ¶ 317.) Again, state court judges—not the City—"imposed" many of these "regulations." *See* 68 Pa. Stat. & Cons. Stat. Ann. §§ 1104–05 (describing the state court's role in Act 135 proceedings). And issuing municipal code violations or work permits, based on unsafe conditions Plaintiffs let fester, is not "functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain." *Nekrilov v. City of Jersey City*, 45 F.4th 662, 678 (3d Cir. 2022) (quoting *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 540 (2005)); *Tulio v. Landsdale Borough*, 660 F. Supp. 3d 368, 379 (E.D. Pa. 2023) (weighing against a regulatory taking where the government action is "closer to . . . some public program adjusting the benefits and burdens of economic life to promote the common good" (citation omitted)).

**6**

Without an underlying constitutional violation, *see supra* subsections IV.B.3–5, Plaintiffs cannot state a *Monell* claim against the City.  "It is well-settled that, if there is no violation in the first place, there can be no derivative municipal claim."[16] *Mulholland v. Gov't Cnty. of Berks*, 706 F.3d 227, 238 n.15 (3d Cir. 2013); *Los Angeles v. Heller*, 475 U.S. 796, 799 (1986).

**7**

Nor do Plaintiffs state a claim for fraud or fraudulent misrepresentation against PCDC, Champagne, Toner or Toner Law.  This claim has six elements: (1) a misrepresentation, (2) which is "material to the transaction at hand," (3) made "with knowledge of its falsity or recklessness as to whether it is true or false," (4) with the "intent of misleading another into relying on it," (5) "[j]ustifiable reliance on the misrepresentation" and (6) a "resulting injury proximately caused by such reliance." *SodexoMAGIC, LLC v. Drexel Univ.*, 24 F.4th 183, 205 (3d Cir. 2022) (quoting *Gibbs v. Ernst*, 647 A.2d 882, 889 & n.12 (Pa. 1994)).  Allegations of fraud must be made with particularity under Rule 9(b).  *Id.*

---

[16]    Even if they had asserted a constitutional violation, the *Monell* claim would not proceed. Plaintiffs base Count VI on a failure-to-train theory, *see* (SAC ¶¶ 349–50), which requires that the City acted with "deliberate indifference to the rights of persons with whom [city officials] came into contact," *City of Canton v. Harris*, 489 U.S. 378, 388 (1989).  This "stringent standard of fault" requires proof a city official "disregarded a known or obvious consequence" of his failure to train.  *Bd. of Cnty. Comm'rs of Bryan Cnty.*, 520 U.S. at 410.  Deliberate indifference requires that a plaintiff shows a city's employees engaged in a "pattern of similar constitutional violations."  *Connick*, 563 U.S. at 60.

Plaintiffs allege none of that.  They never cite a pattern of similar constitutional violations and don't explain how the City's purported failure caused those alleged violations.  Nor do they identify "specific training the [City] should have offered which would have prevented the deprivation of their constitutional rights" or "establish[] that such training was not provided."  *Reitz v. County of Bucks*, 125 F.3d 139, 145 (3d Cir. 1997).

Plaintiffs point to the same alleged conduct as in Count I, such as representations in insurance applications, Act 135 petitions, and fee petitions.[17]  *See* (SAC ¶¶ 356–79).  As explained, those were not misrepresentations, and they don't reveal any fraudulent intent.  *See supra* subsection IV.B.1.  None of the allegations plausibly show the defendants "intended to mislead [*them*] into reliance on the misrepresentation."  *Kostryckyj v. Pentron Lab'y Techs., LLC, LLC*, 52 A.3d 333, 339 (Pa. Super. Ct. 2012).  Their representations were made to state courts and insurance companies—not Plaintiffs.  Indeed, they recognize "[t]he Court relied on Defendant's representations," (SAC ¶ 383), but never indicate how they did so, *see Monsky v. Amazon.com, Inc.*, No. 26-643, 2026 WL 1483482, at *3 (E.D. Pa. May 27, 2026) (dismissing a fraud claim where the plaintiff "does not explain how he relied in any way on [the defendant's] alleged [misrepresentation], nor how that reliance was the cause of [his] alleged injury").

8

Plaintiffs next try, unsuccessfully, to state a claim for unjust enrichment, which requires: (1) they "conferred benefits on the defendant," (2) the defendant "appreciated such benefits" and (3) "the benefits were accepted and retained under such circumstances that it would be inequitable for the defendant to retain the benefit without the payment of value."  *Salvitti v. Lascelles*, 669 F. Supp. 3d 405, 412 (E.D. Pa. 2023) (citing *Mitchell v. Moore*, 729 A.2d 1200, 1203 (Pa. Super. Ct. 1999)).

---

[17]     Plaintiffs allege "Defendants" made many of these "misrepresentations" without identifying which defendant did so.  *See* (SAC ¶¶ 362, 364, 371, 374, 377); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1422 (3d Cir. 1997) (holding that Rule 9(b) requires a plaintiff to allege the defendants made an intentional or reckless misstatement or omission).

Plaintiffs do not allege they conferred any benefits on the defendants.  They complain about "Defendants" receiving financial benefits related to the conservatorships, (SAC ¶¶ 387–99), but don't connect those purported benefits to anything they did.  "In the absence of a benefit conferred, there can be no claim for unjust enrichment . . . ."  *DiCarlo v. St. Mary Hosp.*, 530 F.3d 255, 268 (3d Cir. 2008); *see also Morlok v. City of Philadelphia*, No. 20-2973, 2022 WL 252185, at *5 (3d Cir. Jan. 26, 2022) ("[U]njust enrichment claims cannot be based on 'speculative' or 'intangible' benefits." (citation omitted)).

9

325 LLC also cannot state a breach of contract claim against Gardner Fox.  Such a claim requires: (1) the existence of a contract, (2) breach of one or more of the duties imposed by the contract and (3) damages.  *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225 (3d Cir. 2003) (citing *CoreStates Bank, N.A. v. Cutillo*, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999)).  Although a plaintiff must typically be a party to the contract to bring a claim, a "third-party beneficiary" can do so where "both contracting parties . . . have expressed an intention that [the plaintiff] be a beneficiary, and that intention must have affirmatively appeared in the contract itself."  *Scarpitti v. Webong*, 609 A.2d 147, 149 (Pa. 1992).

325 LLC never says it had a contract with Gardner Fox.  It claims PCDC and Gardner Fox "entered into a written construction agreement in connection with remediation of the property," *see* (SAC ¶¶ 407–08), and conclusorily alleges it was "an intended and direct beneficiary of the construction work performed under the agreement," (*Id.* ¶ 409.)  Nothing suggests PCDC or Gardner Fox expressed an

23

intention for 325 LLC to be a beneficiary to the construction agreement, nor does it plausibly allege such an intention appeared in the agreement.

10

325 LLC alleges negligent construction against Gardner Fox, Hybar, Mangual, Bustamante and Bustamante Engineers, but that claim is time-barred. The Third Circuit permits a plaintiff to raise a limitations defense by a Rule 12(b)(6) motion only if "the time alleged in the statement of a claim shows that the cause of action has not been brought within the [required time]." *Robinson v. Johnson*, 313 F.3d 128, 135 (3d Cir. 2002) (citation omitted). "If the bar is not apparent on the face of the complaint, then it may not afford the basis for a dismissal of the complaint under Rule 12(b)(6)." *Id.* (citation omitted).

Negligence has a two-year limitations period. *See* 42 Pa. Stat. & Cons. Stat. Ann. § 5524(7). Pennsylvania courts favor a strict application of statutes of limitations, and the time to file suit begins to run as soon as the right to institute and maintain a suit arises. *See Perelman v. Adams*, 945 F. Supp. 2d 607, 614 (E.D. Pa. 2013) (quoting *Fine v. Checcio*, 870 A.2d 850, 857 (Pa. 2005)). Although "mistake, misunderstanding, or lack of knowledge . . . do not toll the running of that statute," the "discovery rule" does so where "the injury or its cause was neither known nor reasonably knowable." *Drelles v. Mfrs. Life Ins.*, 881 A.2d 822, 831 (Pa. Super. Ct. 2005). To invoke the discovery rule, Plaintiffs must show "a reasonable effort to discover the cause of an injury under the facts and circumstances present in the case." *Crouse v. Cyclops Indus.*, 745 A.2d 606, 611 (Pa. 2000). They need not know the "exact nature" of their injury, *Mest v. Cabot Corp.*, 449 F.3d 502, 510 (3d Cir. 2006), but they must have

24

"actual or constructive knowledge of at least some form of significant harm," even if they don't know its "precise cause," *SodexoMAGIC*, 44 F.4th at 219.

Plaintiffs filed this suit on December 5, 2025, (Dkt. No. 1), and allege the defendants breached their duties by performing substandard work on 325 S. 18th:

- Gardner Fox "failed to correct known structural deficiencies," presented defective work as complete, and did not ensure the property complied with municipal codes.

- Hybar's work "did not result in durable or code-compliant improvements" and "contribut[ed]" to the structurally deficient conditions.

- Mangual did not properly address structural conditions and "participat[ed]" in work that deteriorated the property.

- Bustamante and Bustamante Engineers provided certifications that "did not accurately reflect the condition of the property," represented the work had been completed, and later identified the same issues.

*See* (SAC ¶¶ 421–24).

None of those purported breaches occurred within two years of this lawsuit. PCDC entered into a construction agreement with Gardner Fox after it was appointed conservator in May of 2017. *See* (*Id.* ¶¶ 83, 98); *Rufo v. Fox*, No. 21-2861, 2021 WL 5399912, at *1 (E.D. Pa. Nov. 18, 2021). All work on the property occurred between September of 2018 and March of 2021. *See* (*Id.* ¶¶ 131–33); (PCDC's Cost & Fee Rep., SAC Ex. A, Dkt. No. 41-1); (PCDC Ledger / Payment Summ., SAC Ex. B, Dkt. No. 41-1). PCDC certified Gardner Fox finished its work in September of 2020, *see* (Conservator's Status Rep. ¶¶ 9–10, 15), and requested remediation costs in January of 2022, which the state court approved in October of 2022, *see* (SAC ¶¶ 123–24, 130–33). L&I officials issued municipal code violations in November of 2022 and March of 2023. (*Id.* ¶¶ 118–119); (Photos. of Mun. Code Violations at 51, 53–55, 60.) Finally, Bustamante

25

submitted a report in December of 2022 "identifying loose bricks, mortar deterioration, and the need for chimney-related repair." (SAC ¶ 113.)

Plaintiffs' own admissions preclude reliance on the discovery rule. They recorded drone footage of 325 S. 18th, apparently confirming their suspicions about the property, in September and October of 2020. (Photos. Evid. of Prop. Condition at 78–113, SAC Ex. H, Dkt. No. 41-1.) They took photographs of violation notices in November of 2022 and March of 2023, *see* (SAC ¶¶ 118–119); (Photos. of Mun. Code Violations at 51, 53–55, 60), and complained about these conditions, which they supported with "photographs and other documentation," to L&I staff, *see* (SAC ¶¶ 345.) Feibush even emailed Adams in November of 2022 that "[t]here is no objective dispute on the poor and inadequate work completed," the building "add[ed] no value," and "[e]veryone who touched this property did so from a position of greed." (*Id.* ¶¶ 141–42); (Nov. 23, 2022 email from Feibush to Adams at 118.) They acknowledge these events, saying the Second Amended Complaint "alleges that the work was represented as complete in 2020 was contradicted only later, when L&I declared the structure unsafe on October 31, 2022, issued violations, and new permits issued in January 2023 for the same masonry and chimney work." (Pls.' Consol. Mem. of L. at 40.) So they had notice of their injuries—and the defendants' purported breaches—during the limitations period.

Most importantly, Plaintiffs have litigated every aspect of the conservatorships since 2017. *See generally* (Toner Defs.' Rule 12(b)(6) App'x of R. Docs.). The notion that they, somehow, unearthed supposedly shoddy work at 325 S. 18th only two years ago is absurd.

11

Plaintiffs' professional negligence claim against Bustamante, Bustamante Engineers and Moto founders for the same reason.  As an initial matter, Fassett brings this claim but only makes one passing reference to 5105 Overbrook.  (SAC ¶ 433.) Indeed, Count XI focuses entirely on 325 S. 18th and never specifies how Bustamante or Moto breached their alleged duties with respect to Fassett.[18]  *See* (*Id.* ¶¶ 429–40). Without allegations specific to him or his property, his negligence claim cannot proceed. *See Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level . . . .").

With respect to 325 S. 18th, Plaintiffs allege Bustamante and Bustamante Engineers breached their duty by submitting representations and certification that "were inaccurate" or "made without adequate investigation and verification."  (SAC ¶ 439.)  Moto billed for design and planning work, but it purportedly never fixed structural deterioration, masonry and façade failures, and roof drainage deficiencies. (*Id.* ¶¶ 443–45.)

Once more, these "breaches" did not occur within two years of this lawsuit. Bustamante identified structural defects in the property in 2017.  (*Id.* ¶ 108.)  Gardner Fox subcontracted engineering services to Bustamante and his firm, (*id.* ¶ 108), and design to Moto, (*id.* ¶ 105.)  They remediated the property from January of 2017 to March of 2021.  *See* (*id.* ¶¶ 131–33); (PCDC's Cost & Fee Rep. at 5–17); (PCDC Ledger / Payment Summ. at 19–20).  Bustamante represented that work had finished in July of 2022, (SAC ¶ 435), but submitted a report in December of 2022 that certain issues

---

[18]    Moto never worked on 5105 Overbrook.  *See* (*Id.* ¶¶ 74–75, 105–06, 135).

lingered, *see* (*id.* ¶ 113).  Those events predate this lawsuit by at least three years, and the discovery rule does not apply for reasons already explained, *see supra* subsection IV.B.10.

12

Plaintiffs save their most implausible (if that's possible) claim for last: civil conspiracy against all defendants but the City.  (SAC at 98.)  To state such a claim, a plaintiff must allege: "(1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose, (2) an overt act done in pursuance of the common purpose, and (3) actual legal damage."  *Phillips v. Selig*, 959 A.2d 420, 437 (Pa. Super. Ct. 2008).  Civil conspiracy "must be based on an independent underlying civil cause of action."  *NRA Grp., LLC v. Durenleau*, 154 F.4th 153, 172 (3d Cir. 2025) (citation omitted).  "A plaintiff must show 'proof of malice'—that the conspiracy was committed with 'intent to do an unlawful act by unlawful means' and 'an intent to injure . . . absent justification.'"  *Id.* (quoting *Thompson Coal Co. v. Pike Coal Co.*, 412 A.2d 466, 472 (Pa. 1979)).  Malice "is a demanding standard: malicious intent must be the *sole* purpose of the conspiracy."  *Id.* (citation omitted)

Plaintiffs don't even scare these requirements.  First, they fail to state an underlying cause of action.  *See supra* subsections IV.B.1–11.  Second, they conclusorily allege the defendants "agreed to engage in coordinated conduct" related to the Act 135 proceedings, (SAC ¶ 449), but that conduct is nothing more than "two or more persons, each with the right to do a thing, happen[ing] to do that thing at the same time," *see Thompson Coal Co.*, 412 A.2d at 473; *see also Ozburn-Hessey Logistics, LLC v. 721*

28

*Logistics, LLC*, 40 F. Supp. 3d 437, 454 n.4 (E.D. Pa. 2014) (finding no civil conspiracy where defendants act "solely" to advance their own "legitimate business interests"). Third, they conclusorily accuse Defendants of acting maliciously, imposing cost claims for their own profit, and harming their property interests and equity.  (SAC ¶¶ 463–64.)

V

Several defendants also move to designate Plaintiffs and Adams as "vexatious litigants" and bar them from filing new actions concerning Act 135 petitions for 325 S. 18th and 5105 Overbrook without prior approval.

The Court already addressed this motion, *see 325 S. 18th St., LLC*, 2026 WL 482850, at *5 (denying with respect to 325 LLC and Adams), and Plaintiffs have not filled additional cases since then.  This lawsuit is repetitive and meritless, but does not warrant the "extreme remedy" the Defendants seek.  *In re Oliver*, 682 F.2d 443, 446 (3d Cir. 1982); *Silver v. Barclays Bank Del.*, No. 21-1630, 2023 WL 2306730, at *2 (D. Del. Mar. 1, 2023) (filing a second meritless case after the first one was dismissed did not justify an injunction).  325 LLC, Fassett and Adams[19] are instead placed on notice that filing additional cases related to the conservatorships will result in an order to show cause directing them to explain why an injunction should not issue.

VI

Courts should freely give leave to amend a complaint "when justice so requires." Fed. R. Civ. P. 15(a)(2).  This rule expresses "a preference for liberally granting leave to

---

[19]    Adams, thankfully, cannot represent either plaintiff for at least five years.  *See* (Apr. 17, 2026 Ord. Suspending Adams); *Rowland v. Cal. Men's Colony, Unit II Men's Advisory Couns.*, 506 U.S. 194, 201–02 (1993) ("It has been the law for the better part of two centuries . . . that a corporation may appear in the federal courts only through licensed counsel."); *McCain v. Abraham*, 337 F. App'x 141, 142 (3d Cir. 2009) ("[A] *pro se* litigant who is not an attorney may not represent someone else in federal court.").

29

amend" unless "amendment would cause undue delay or prejudice, or that amendment would be futile." *Oran v. Stafford*, 226 F.3d 275, 291 (3d Cir. 2000). "Futility" means that "the complaint, as amended, would fail to state a claim upon which relief could be granted." *Shane v. Fauver*, 213 F.3d 113, 115 (3d Cir. 2000).

Allowing amendment would be futile for two reasons. First, the Court dismissed the initial complaint because it "largely consist[ed] of conclusory and vague allegations" that did not "raise a right to relief above the speculative level." *325 S. 18h St., LLC*, 2026 WL 482850, at *3–4 (citation omitted). Plaintiffs then filed an amended complaint but sought leave to amend again because they had "not fully cure[d] the concerns articulated in the Court's memorandum." (Mot. for Leave to File SAC ¶ 4, Dkt. No. 38.) They still have not done so. Their "repeated failure to cure deficiencies by amendments previously allowed" weighs against giving them a third chance. *See Lorenz v. CSX Corp.*, 1 F.3d 1406, 1413 (3d Cir. 1993) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

Second, this lawsuit is meritless. Plaintiffs sued thirteen defendants on a laundry list of claims, none of which were plausible. No set of facts could support their claims, *see supra* Section IV.B, and many are similar to those Rufo already brought five years ago—which this Court and the Third Circuit rejected as conclusory and implausible, *see Rufo*, 2021 WL 5399912 *aff'd* 2022 WL 16646689. They have pressed every aspect of the conservatorship in state and federal courts for nine years. They have tested their theories in countless motions, appeals and hearings, all of which have failed. *See 325 S. 18th St., LLC*, 2026 WL 482850, at *1. Yet they continue, nearly a decade later, to pursue claims based on scant evidence, putting everyone else to the

30

task of deciphering their ramblings.  "Although the federal rules generally favor a liberal amendment policy, justice does not demand that [Plaintiffs] be given leave to append frivolous or repetitive allegations to [their] complaint at any stage in the proceedings."  *Coleman v. Ramada Hotel Operating Co.*, 933 F.2d 470, 473 (7th Cir. 1991).

Plaintiffs repeatedly ask for leave to file a third amended complaint—an apparent recognition of their doomed claims.  They promise they "can plead with greater particularity" and "cure" whatever issues the Court may identify.  (Pls.' Consol. Mem. of L. at 7, 53, 59.)  Counsel also says he didn't draft the pleadings and entered this case after the Second Amended Complaint had been filed, making this a "textbook" case for amendment.  (Pls.' Mem. of L. in Opp'n to Toner Defs. at 27); (Pls.' Consol. Mem. of L. at 7, 35, 53–54.)  None of those arguments have any bearing on futility, and they cite nothing to suggest differently.  And counsel's argument is belied by statements he made during the on-the-record status conference last month.  He cannot now distance himself from the Second Amended Complaint after he expressly "adopted all of the allegations in it," stood by its claims, and said he would respond to the motions to dismiss rather than seek leave to amend.  *See* (May 13, 2026 Status Conf. at 4:14–24, 6:18–7:3, 7:20–8:8, 11:18–12:17).

Counsel—especially Adams—needed to vet their clients' claims more fully or at some point realize that this lawsuit wasn't going anywhere.  By doing otherwise, Plaintiffs have exposed themselves to potential sanctions and fines.  Indeed, Adams has already been suspended for five years by the Pennsylvania Supreme Court.  The Court need not, for now, go further.

31

An appropriate Order follows.

BY THE COURT:


*/s/ Gerald J. Pappert*
Gerald J. Pappert, J.